**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER | ) ) ) ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 1:11-cv-02261-JDB |
| | ) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY | ) ) |
| | ) |
| Defendant. | ) ) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY
JUDGMENT**

Plaintiff the Electronic Privacy Information Center ("EPIC") opposes Defendant

U.S. Department of Homeland Security's ("DHS") August 1, 2012 Motion for Summary

Judgment, and Cross-moves for Summary Judgment in favor of EPIC. Specifically EPIC

(1) challenges the sufficiency of the agency's Vaughn index; and, (2) seeks an order

compelling the DHS to conduct a segregability analysis with regard to the documents it

has withheld.

**FACTUAL BACKGROUND**

On February 1, 2011, DHS announced that the agency planned to implement

"Publicly Available Social Media Monitoring and Situational Awareness Initiatives." The

initiatives were designed to gather information from "online forums, blogs, public websites,

and message boards," to store and analyze the information gathered, and then to

"disseminate relevant and appropriate de-identified information to federal, state, local, and

foreign governments and private sector partners." 76 Fed. Reg. 5603 (2011).

1

Previously, DHS had undertaken surveillance of public chats and other online forums concerning specific events, such as the January 2010 earthquake in Haiti, the 2010 Winter Olympics, and the April 2010 BP oil spill. *See* DHS, Privacy Impact Assessment for the Office of Operations Coordination and Planning Haiti Social Media Disaster Monitoring Initiative, January 21, 2010*;* DHS, Privacy Impact Assessment for the Office of Operations Coordination and Planning 2010 Winter Olympics Social Media Event Monitoring Initiative, February 10, 2010; DHS, Privacy Impact Assessment for the Office of Operations Coordination and Planning April 2010 BP Oil Spill Response Social Media Event Monitoring Initiative, April 29, 2010. In June of 2010, however, DHS signaled its intention to pursue ongoing monitoring of social media services. Department of Homeland Security, Privacy Impact Assessment for the Office of Operations Coordination and Planning Publicly Available Social Media Monitoring and Situational Awareness Initiative, 2, June 22, 2010. As set out in the Federal Register and the Privacy Impact Assessments, the DHS's social media monitoring initiative would allow the agency to "establish [fictitious] usernames and passwords," create covert social media profiles to monitor other users, deploy search tools, and record the online activity of particular users, based on the presence of such search terms as "drill," "infection," "strain," "recovery," "collapse," "human to animal," and "Trojan." Department of Homeland Security, Privacy Impact Assessment for the Office of Operations Coordination and Planning Publicly Available Social Media Monitoring and Situational Awareness Initiative, 23, Jan. 6, 2011.

DHS stated that it intended to store the information that it obtained from the users of online services for up to five years and to make the information available across the government, including local, state, and federal agencies, and to make it available to

organizations outside of the United States. 76 Fed. Reg. 5603, 5605. The proposed social

media monitoring initiative was designed to gather personally identifiable information

("PII"), including full names, affiliations, positions or titles, and account usernames. *Id.* The

agency stated that it would collect PII "when it lends credibility to the report or facilitates

coordination with federal, state, local, tribal, territorial, foreign or international government

partners." *Id.* at 5604. The agency anticipates retrieving users' information in the normal

course of performing social media searches and plans regularly to relay the records it

produces to its information sharing partners   (although the agency states that it will redact

PII before dissemination). *Id.* According to the DHS Chief Privacy Officer, "[n]o procedures

are in place" to determine which users may access this system of records; even Department

contractors have full access to the system. DHS, Privacy Impact Assessment, 7, Jan. 6,

2011.

Users of social media services, such as Twitter, often provide sensitive and personal

information in their online communications, and they have no reason to believe that the

Department of Homeland Security would routinely record their messages or distribute the

contents of their messages to other government agencies and private parties.

In order to allow the public to assess the privacy risks to social media users, on April

12, 2011, EPIC transmitted its written Freedom of Information Act request ("EPIC's FOIA

request") to DHS for records concerning the agency's social media monitoring initiatives.

Specifically, EPIC asked the DHS to disclose:

> 1.    all contracts, proposals, and communications between the federal
>         government and third parties, including, but not limited to, H.B. Gar
>         Federal, Palantir Technologies, and/or Berico Technologies, and/or parent
>         or subsidiary companies, that include provisions concerning the capability
>         of social media monitoring technology to capture, store, aggregate,
>         analyze, and/or match personally-identifiable information;

2.      all contracts, proposals, and communications between the federal
        government and third parties, including, but not limited to, H.B. Gar
        Federal, Palantir Technologies, and/or Berico Technologies, and/or parent
        or subsidiary companies, that include provisions concerning the capability
        of social media monitoring technology to capture, store, aggregate,
        analyze, and/or match personally-identifiable information;

3.      all documents used by DHS for internal training of staff and personnel
        regarding social media monitoring, including any correspondence and
        communications between DHS, internal staff and personnel, and/or
        privacy officers, regarding the receipt, use, and/or implementation of
        training and evaluation of documents;

4.      all documents detailing the technical specifications of social media
        monitoring software and analytic tools, including any security measures to
        protect records of collected information and analysis; and

5.      all documents concerning data breaches of records generated by social
        media monitoring technology.

EPIC also asked DHS to expedite the response to EPIC's FOIA request as it

pertained to a matter about which there is an urgency to inform the public about an actual

federal government activity, and was made by a person primarily engaged in disseminating

information. 5 U.S.C. § 552(a)(6)(E) (2011). EPIC requested "News Media" fee status,

based on its well established status as a "representative of the news media." *Elec. Privacy

Info. Ctr. v. Dep't of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003). Additionally, EPIC asked

for fee waiver. *Id.*

On April 28, 2011, DHS acknowledged receipt of EPIC's FOIA request on April 19,

2011, and assigned the request reference number DHS/OS/PRIV 11-0736 ("DHS' email").

DHS made no determination on EPIC's fee waiver request. DHS denied EPIC's request for

expedited processing and for "news media" fee status. DHS referred EPIC's request to

several DHS components for processing.

On May 18, 2011, via certified mail, EPIC appealed the DHS's response to EPIC's FOIA request [hereinafter "EPIC's Appeal"]. EPIC also challenged the DHS's denial of EPIC's request for "news media" fee status, and renewed EPIC's request for a fee waiver and expedited processing for the appeal.  DHS received EPIC's Appeal on May 23, 2011.

EPIC filed suit against the agency on December 20, 2011, after the agency failed to respond to the EPIC's Appeal. This was more than seven months after EPIC's FOIA Request was received by the agency.

On January 10, 2012, after the filing of this lawsuit, DHS produced 285 pages of responsive documents ("First Interim Response"). On February 6, 2012, the agency released an additional 39 pages of documents ("Second Interim Response"). On May 31, 2012, the agency released another 213 pages of documents ("Third Interim Response"). On July 9, 2012, the agency released a final 80 pages of documents ("Final Interim Response"). However, the agency has withheld many documents in full, and submitted an insufficient Vaughn index.

As set forth below, EPIC challenges the propriety of the agency's withholdings and Vaughn index.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to the material facts, and the moving party demonstrates it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). FOIA lawsuits are typically resolved on cross-motions for summary judgment. *Reliant Energy Power Generation v. FERC*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007). A court reviews agency handling of a FOIA request *de novo*. 5 U.S.C. § 552(a)(4)(B).

The U.S. Supreme Court "repeatedly has stressed the fundamental principle of public access to Government documents that animates the FOIA." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151-52 (1989). "In enacting FOIA, Congress struck the balance it thought right--generally favoring disclosure, subject only to a handful of specified exemptions--and did so across the length and breadth of the Federal Government." *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1266 (2011). As the Court has previously explained, "[t]he basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  The FOIA's "basic purpose reflect[s] a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *Dept. of the Air Force v. Rose*, 425 U.S. 352, 360-61 (1976), quoting S. Rep. No. 89-813, at 3 (1965). The FOIA was meant to be a "disclosure statute," not a "withholding statute." *See Milner,* 131 S. Ct. at 1262

The FOIA includes exemptions from disclosure, "[b]ut these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of

the Act." *Rose*, 425 U.S. at 361, or that the exemptions "must be 'narrowly construed,'"

*Milner, 131 S. Ct. at 1262,* citing *FBI* v. *Abramson*, 456 U.S. 615, 630 (1982). Therefore

FOIA exemptions "must be narrowly construed." *Id*. "The statute's goal is broad

disclosure, and the exemptions must be given a narrow compass." *Milner* 131 S. Ct. at

1261 (internal citations omitted). Furthermore, "the burden is on the agency to sustain its

action." 5 U.S.C. § 552(a)(4)(B); *see also EPIC v. Dept. of Homeland Security*, 384 F.

Supp. 2d 100, 106 (D.D.C. 2005).

## ARGUMENT

### I.    DHS' Vaughn Index is Insufficient

DHS' Vaughn Index is plainly insufficient. It does not contain the detailed

analysis necessary for both the court and the plaintiff to test the agency's claimed

exemptions. *See Vaughn v. Rosen*, 484 F.2d 820, 823-27 (D.C. Cir. 1973). Instead, the

DHS improperly relies on conclusory, boilerplate descriptions to justify its withholdings.

### A.   A Vaughn Index Must Show Why the Documents Fall Within the Exemption With Reasonable Specificity

In *Vaughn v. Rosen*, the D.C. Circuit created a framework within which

government agencies shall respond to FOIA requests. *Id*. The Court outlined what came

to be known as a "Vaughn index," requiring "relatively detailed analysis in manageable

segments" of each document claimed to be exempt under FOIA. *Id*. at 826. Without such

information, a FOIA plaintiff is unable to "argue with desirable legal precision for the

revelation of the concealed information." *Id*. at 823. While the index need not follow a

specific formula, "the least that is required[] is that the requester and the trial judge be

able to derive from the index a clear explanation of why each document or portion of a

document withheld is putatively exempt from disclosure." *Hinton v. Dep't of Justice*, 844

F.2d 126, 129 (3d Cir. 1988). The Vaughn index is meant to further "FOIA's unambiguous policy in favor of the fullest possible disclosure of government records." *Founding Church of Scientology of Washington, D.C., Inc. v. Bell*, 603 F.2d 945, 949 (D.C. Cir. 1979).

Specifically, a Vaughn index must not be merely "[c]onclusory and generalized allegations of exemptions" but must instead contain "[a]n indexing system (that) would subdivide the document under consideration into manageable parts cross-referenced to the relevant portion of the Government's justification." *Ray v. Turner*, 587 F.2d 1187, 1191 (D.C. Cir. 1978). The index is meant to allow the court and FOIA plaintiff to "locate specific areas of dispute" and assist judicial review. *Id.* at 1192. At the very least, a *Vaughn* index must 1) "be contained in one document", 2) "adequately describe each withheld document or deletion", and 3) " state the exemption claimed for each deletion or withheld document, and explain why the exemption is relevant." *Bell* at 949. While the descriptions "need not be so detailed as to reveal that which the agency wishes to conceal,[] they must be sufficiently specific to permit a reasoned judgment as to whether the material is actually exempt under FOIA." *Id.*

The agency has the burden to show, "with reasonable specificity, why the documents fall within the exemption." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998) (quoting *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1387 (D.C. Cir. 1979). A Vaughn index is inadequate when it contains merely "boilerplate" without tailoring its explanations to each specific document. *See Wiener v. F.B.I.*, 943 F.2d 972, 978-79 (9th Cir. 1991). "Categorical description of redacted material coupled with

categorical indication of anticipated consequences of disclosure is clearly inadequate."

*King v. U.S. Dep't of Justice*, 830 F.2d 210, 224 (D.C. Cir. 1987).

Summary judgment is appropriate only if the agency has adequately met the

requirements for a sufficient Vaughn index. "A court cannot grant summary judgment

unless the defendant's Vaughn index provides a detailed description of the withheld

information, the exemption claimed for withholding the information, and the reasons

supporting the application of the exemption to the withheld material." *EPIC v. DHS,* 384

F.Supp.2d 100, 109 (D.D.C. 2005). "Agency statements in the Vaughn index cannot

support summary judgment if they are 'conclusory, merely reciting statutory standards, or

if they are too vague or sweeping.'" *Id*. (quoting *Oglesby v. U.S. Dep't of Army*, 79 F.3d

1172, 1176 (D.C. Cir. 1996)).

### B.  DHS's Vaughn Index Contains Only Inadequate "Boilerplate" Explanations of the Claimed Exemptions.

The Vaughn index submitted by DHS does not meet the legal requirement of

reasonable specificity. Rather, it contains boilerplate explanations of its content. In many

cases it "merely recites the statutory standards" with almost no detail or analysis of the

purportedly exempt document. *See Oglesby* at 1176. Many items contain seemingly

copied and pasted descriptions with no attempt to explain why DHS withholds parts of

some documents and releases others. This index does not provide enough information to

make a "reasoned judgment as to whether the material is actually exempt under FOIA."

*Bell* at 949.

DHS' Vaughn index is 23 pages enumerating 39 documents, only four of which

are released in full. Fourteen of the first fifteen documents listed have the exact same

one-sentence description: "This document is part of a contract processing file." DHS

Vaughn Index Items #1-15. DHS then states boilerplate statutory standards and concludes

the standards apply, with no application or analysis. *Id.* Despite using the exact same

description for all fourteen of these documents, DHS gives no rationale for why or how

different FOIA exemptions apply to different documents. DHS even uses the same

description for a document released in full as those partially withheld, with no

explanation of the discrepancy. *Id.* at #9. These descriptions provide little useful

information for why these documents are partially withheld or why the statutory

exemptions apply.

Item #14, an "Award Decision Memorandum," states in triplicate that it is "part of

a contract processing file" and claims exemption under b(3), b(4), and b(6), but it

provides no detail, specificity, or analysis as to why those exemptions apply. *Id.* at #14. It

appears to simply replicate the same boilerplate statutory language as the other items.

Another thirteen items contain no description whatsoever. *Id.* at #18-21 and #23-

31. The only information stated about these documents is their titles on the list. DHS

gives carbon-copy statutory exemption language without specific analysis of the listed

items. No explanation is given for why the documents are partially withheld. For some of

the items, it is not even apparent what they are. *See e.g. id.* at #18 (listed as "Social

Network/Media Capability (SNMC) Battle Rhythm Version 11"). The remaining eight

items use the same conclusory statutory language, but with minimal descriptions of the

items themselves. *Id.* at #32-39.

For nearly every item in its Vaughn index, DHS provides insufficient information

about what the documents are, what they contain, and how their contents relate to the

claimed exceptions. DHS fails to provide "a detailed description of the withheld

information" for different documents that claim different (or no) exemptions. *EPIC v.*
*DHS* at 109. DHS reiterates statutory boilerplate without any specific "reasons supporting
the application of the exemption[s] to the withheld material." *Id*. The information
provided by DHS in its Vaughn index does not meet the legal requirements of
"reasonable specificity." It is inappropriate to grant DHS' motion for summary judgment
because DHS fails to meet its burden to enable the requesters and the court "to derive
from the index a clear explanation of why each document or portion of a document
withheld is putatively exempt." *Hinton* at 129.

## II.     DHS Has Not Released All Segregable Portions of Documents

Even if the agency establishes that it has properly withheld portions of documents
under FOIA Exemptions (b)(4), (b)(6), (b)(7)(C), and (b)(7)(E), "[a]ny reasonably
segregable portion of a record shall be provided to any person requesting such record
after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b);
*see also Roth v. U.S. Dep't of Justice,* 642 F.3d 1161, 1167 (D.C. Cir. 2011) (finding that
an agency "must nonetheless disclose all reasonably segregable, nonexempt portions of
the requested record(s)"); *North v. U.S. Dep't of Justice,* 774 F.Supp.2d 217, 222 (D.D.C.
2011) (citing *Oglesby v. U.S. Dep't of the Army,* 79 F.3d 1172, 1178 (D.C. Cir. 1996)).
"The agency bears the burden of demonstrating that withheld documents contain no
reasonably segregable factual information." *Mokhiber v. U.S. Dep't of Treas.*, 335 F.
Supp. 2d 65, 69 (D.D.C. 2004), *citing Army Times Pub. Co. v. Dep't of Air Force,* 998
F.2d 1067, 1068 (D.C. Cir. 1993); *Mead Data Central, Inc. v. U.S. Dep't of Air Force,*
566 F.2d 242, 260 (D.C. Cir. 1977). Here, DHS and the Secret Service ("USSS") have

not clearly demonstrated in the Vaughn Index or through their respective declarations that the documents contain no reasonably segregable factual information.

The USSS withheld USSS Vaughn Index Items #4-6, 10, and 16 in their entirety. USSS Vaughn Index Item #10 is a twenty-two page presentation and USSS Vaughn Index Items #4-6 and 16 are various contracts. USSS Vaughn Index at 2-3, 6, 9. Additionally, USSS Vaughn Index Items #12 and 13 are emails that contain attached contract modifications that were withheld in their entirety. USSS Vaughn Index at p. 7. With respect to the above-mentioned documents, USSS failed to provide the required detailed justification to withhold non-exempt material as non-segregable. *See Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261-62 (D.C. Cir. 1977) (describing the withholding agency's responsibility to provide a detailed justification for withholding non-exempt portions of a document and how the distribution of the non-exempt information within that document should be provided).

Similarly, Defendants' Vaughn Index lacks the necessary specificity to meet the segregability analysis required by FOIA. For example, USSS Vaughn Index Item #5, USSS-000026-47 is described as a "[n]ine page contract with an order date of March 19, 2008, and a thirteen page statement of work dated January 24, 2008, withheld in full." USSS Vaughn Index at p. 3. The Vaughn Index's cursory explanation for several exemptions claimed for USSS Vaughn Index Item #5 fails to provide the "specificity required to justify non-segregation." *See McGehee v. Dep't of Justice*, 800 F.Supp.2d 220, 238 (D.D.C. 2011) (citing *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002)). The USSS' Vaughn Index, in fact, fails to address segregability, as does the corresponding *Ferrell Declaration.* These documents are not enough to meet

FOIA's segregability requirements and segregability requirements established by D.C. Circuit. "An agency should also describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead*, 566 F.2d at 261.

In several documents, withheld in full, DHS cites Exemptions (b)(6) and (b)(7)(C) because these documents contain the names, email, phone number, or addresses of Secret Service personnel. USSS Vaughn Index at pp. 2-3, 6-7, & 9. Such records are easily segregable. DHS also cites Exemption (b)(4) where documents contain "company pricing information" or "proprietary and confidential company commercial and financial information." USSS Vaughn Index at pp. 3-4, 9. The agency cites exemption (b)(4) for many of the contract documents withheld in full. "While contracts may certainly contain information, such as the price of goods being sold, the entire contract [sic] itself cannot qualify as 'information' in any ordinary sense of either word." *Piper & Marbury, L.L.P. v. U.S. Postal Service*, No. CIV.A. 99-2383 (JMF/CKK), 2001 WL 214217 at *4 (D.D.C. 2001).

These exemptions may be properly asserted to select portions of the withheld documents, but the agency must segregate all non-exempt portions of those documents. 5 U.S.C. § 552(b).

Exemption (b)(7)(E) is also asserted to withhold in full several documents. For example, the information withheld in USSS Vaughn Index Item #4 is described as "[d]escriptions of sensitive software modifications necessary for utilization in protective intelligence operations and investigations." USSS Vaughn Index at 2-3. As with Exemption (b)(4) above, the information withheld under (b)(7)(E) is not likely to be

present in the entire contract and the segregability analysis is a "requirement [that] applies to all information withheld under any exemption." *Am. Immigration Lawyers Ass'n v. U.S. Dep't of Homeland Sec.*, 852 F.Supp.2d 66, 81 (D.D.C. 2012).

Exemption (b)(7)(E) is asserted to withhold in full a PowerPoint presentation (Document 10, USSS-000077-98), yet no title is provided for the PowerPoint presentation and the document otherwise lacks any characterization justifying withholding non-exempt information. USSS Vaughn Index at p. 6. With respect to USSS Vaughn Index Items #4-6, 10, 12-13, and 16, the relevant portions of the USSS Vaughn Index and *Ferrell Declaration* lack any analysis of why non-exempt information is not segregable.

A "detailed justification for an agency decision that non-exempt material is not segregable" is an important requirement of FOIA that "not only cause[s] the agency to reflect on the need for secrecy and improve adversarial position of FOIA plaintiffs, but it also enable the courts to conduct their review on an open record and avoid routine reliance on in camera inspection." *Mead* 566 F.2d at 261-62. Thus, because DHS failed to demonstrate that non-exempt information is "inextricably intertwined with exempt portions," the non-exempt portions should be segregated.. *Id.* at 260.

### III.   EPIC Is Entitled to Recover Its Costs and Fees

#### A.  EPIC "Substantially Prevailed" by Forcing Disclosure of DHS Records

Irrespective of the outcome of the parties' cross-motions for summary judgment, EPIC is entitled to recover its fees and costs from the DHS in this matter. EPIC asks the Court to enter judgment as to EPIC's eligibility and entitlement to fees and to order further briefing as to the amount of costs and fees. "The court may assess against the

United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E). "A complainant has substantially prevailed if the complainant has obtained relief through … a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." *Id*. The determination of whether the plaintiff has "substantially prevailed" is "largely a question of causation." *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1496 (D.C. Cir. 1984); *Church of Scientology v. Harris*, 653 F.2d 584, 587 (D.C. Cir. 1981). The key inquiry is "did the institution and prosecution of the litigation cause the agency to release the documents obtained during the pendency of the litigation?" *Church of Scientology*, 653 F.2d at 587.

EPIC has already "substantially prevailed" in this lawsuit. As described above and in the Defendant's Motion for Summary Judgment, EPIC filed its FOIA request concerning social media monitoring on April 12, 2011. On May 18, 2010 EPIC mailed an administrative appeal to the DHS, challenging the agency's denial of EPIC's request for "news media" fee status, and the denial of fee waiver and expedited processing. On December 20, 2011, EPIC filed this lawsuit challenging the agency's failure to comply with the statutory deadline to reply to EPIC's appeal.

On January 10, 2012, only after the filing of this lawsuit, DHS produced the first substantive response to EPIC's FOIA Request. The agency provided EPIC with 285 pages of responsive documents. On February 6, 2012, the agency released an additional 39 pages of documents.  On May 31, the Secret Service, a DHS component, provided EPIC with another 213 pages of documents. Finally, on July 9, the agency provided EPIC with 80 more pages of documents. "The institution and prosecution" of this suit plainly

"cause[d] the agency to release the documents obtained during the pendency of the litigation." *Id*.

### B.   The Court Should Award EPIC Costs and Fees In This Case

"The court should consider [four factors] in determining the appropriateness of an award of costs and attorney fees." *Cuneo v. Rumsfeld*, 553 F.2d 1360, 1365 (D.C. Cir. 1977). The four factors are: 1) "the benefit to the public, if any, deriving from the case;" 2) "the commercial benefit of the complainant;" 3) "the nature of [the complainant's] interest in the records sought"; and 4) "whether the government's withholding of the records sought had a reasonable basis in law." H. Comm. on Gov't Operations and S. Comm. on the Judiciary, 94th Cong., *Freedom of Information Act and Amendments of 1974 (Pub. L. No. 93-502) Source Book,* 189-90 (J. Comm. Print 1975). "Public benefit" can be demonstrated by a "newsman who seeks information to be used in a publication or the public interest group seeking information to further a project benefitting the general public." *Davy v. C.I.A.*, 550 F.3d 1155, 1158 (D.C. Cir. 2008). The "public benefit" factor supports an award where the complainant's victory is "likely to add to the fund of information that citizens may use in making in making vital political choices." *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995) (citations omitted). D.C. District Court has found that news media coverage is relevant for determining "public benefit." *Elec. Privacy Info. Ctr. v. U.S. Dept. of Homeland Sec.,* 811 F. Supp. 2d 216, 233-34 (D.D.C. 2011).

EPIC's FOIA suit provided substantial benefit to the public. EPIC maintains two of the most popular websites in the world - www.epic.org and www.privacy.org - for searches on the term "privacy." EPIC disseminated the agency records it received on its

www.epic.org web site[1] and to the approximately 8,000 recipients of its bi-weekly

newsletter.[2] EPIC's FOIA work in this matter was prominently featured in the

*Washington Post* as well as several other publications.

> With the explosion of digital media, DHS has joined other intelligence and law enforcement agencies in monitoring blogs and social media, which is seen as a valuable tool in anticipating trends and threats that affect homeland security, such as flu pandemics or a bomb plot.
>
> But monitoring for "positive and negative reports" on U.S. agencies falls outside the department's mission to "secure the nation," said the Electronic Privacy Information Center, which obtained a copy of a contract and related material describing DHS's social media monitoring through its FOIA suit.
>
> According to the documents, the department's Office of Operations Coordination and Planning awarded a contract in 2010 to Fairfax-based General Dynamics' Advanced Information Systems. The company's task is to provide media and social media monitoring support to Homeland Security's National Operations Center (NOC) on a "24/7/365 basis" to enhance DHS's "situational awareness, fusion and analysis and decision support" to senior leaders.

Ellen Nakashima, "DHS monitoring of social media concerns civil liberties advocates,"

*Washington Post*, Jan. 13, 2012.[3] *See also* "Privacy Group Sues DHS Over Social Media

Monitoring Program," FOX News, Dec. 24, 2011;[4] Liz Klimas, "Which Keywords On

Twitter Get the Government's Attention?" The Blaze, Dec. 28, 2011;[5] Mark Hosenball,

"Homeland Security watches Twitter, social media," Reuters, Jan. 11, 2012;[6] Jaikumar

---

[1] http://epic.org/foia/epic-v-dhs-media-monitoring/

[2] http://epic.org/alert/epic_alert_1825.html

[3] http://www.washingtonpost.com/world/national-security/dhs-monitoring-of-social-media-worries-civil-liberties-advocates/2012/01/13/gIQANPO7wP_story.html

[4] http://www.foxnews.com/politics/2011/12/24/privacy-group-sues-dhs-over-social-media-monitoring-program

[5] http://www.theblaze.com/stories/which-keywords-on-twitter-get-the-governments-attention/

[6] http://www.reuters.com/article/2012/01/11/us-usa-homelandsecurity-websites-idUSTRE80A1RC20120111

Vijayan "DHS media monitoring could chill public dissent, EPIC warns," Computer

World, Jan. 16, 2012;[7] J. David Goodman, "Travelers Say They Were Denied Entry to

U.S. for Twitter Jokes," *New York Times*, Jan. 30, 2012;[8] Mark Rockwell, "DHS social

media monitoring practices revealed under FOIA," Government Security News, May 29,

2012;[9] Robert N. Charette, "Do You Need to Worry About DHS Looking at Your Social

Media Conversations?" IEEE Spectrum, May 29, 2012;[10] Kevin Fogarty, "DHS list of

words you should never ever blog or Tweet. Ever." IT World, May 31, 2012.[11]

     EPIC's work in this matter also contributed significantly to the oversight

functions of Congress. On February 16, 2012, Congresss held a hearing entitled "DHS

Monitoring of Social Networking and Media: Enhancing Intelligence Gathering and

Ensuring Privacy." Representative Patrick Meehan, the Chairman of the Subcommittee

on Counterterrorism and Intelligence, stated:

> A few weeks ago, it was reported that DHS had instituted a program to
> produce short reports about threats and hazards. However, in something
> that may cross the line, these reports also revealed that DHS had tasked
> analysts with collecting intelligence on media reports that reflect adversely
> on the U.S. Government and the Department of Homeland Security.
>
> In one example, DHS used multiple social networking tools - including
> Facebook, Twitter, three different blogs, and reader comments in
> newspapers to capture resident's reactions to a possible plan to bring
> Guantanamo detainees to a local prison in Standish, MI.

---

[7] http://www.computerworld.com/s/article/9223441/DHS_media_monitoring_could_chill
_public_dissent_EPIC_warns

[8] http://thelede.blogs.nytimes.com/2012/01/30/travelers-say-they-were-denied-entry-to-u-s-for-twitter-jokes/

[9] http://www.gsnmagazine.com/node/26448?c=federal_agencies_legislative

[10] http://spectrum.ieee.org/riskfactor/telecom/internet/do-you-need-to-be-careful-about-the-words-you-use-in-social-media-conversations

[11] http://www.itworld.com/security/279429/dhs-list-words-you-should-never-ever-blog-or-tweet-ever

> In my view, collecting, analyzing, and disseminating private citizens'
> comments could have a chilling effect on individual privacy rights and
> people's freedom of speech and dissent against their government.

*Enhancing Intelligence Gathering and Ensuring Privacy, hearing on DHS Monitoring of*

*Social Networking and Media before the Committee on Homeland Security's*

*Subcommittee on Counterterrorism and Intelligence*, 112th Cong. (2012) (statement of

Patrick Sheehan, Chairman, Subomm. On Counterterrorism and Intelligence).[12]

Representative Jackie Speier, the Subcommittee's ranking member, stated:

> I am deeply troubled by the document that has just been put into the record
> by epic.org, and while you have probably not had the opportunity yet to
> review it, Mr. Chairman, I would like to ask, after they do review it, to
> report back to this Committee, and provide us with answers to the
> questions raised. So I'm going to start with a couple of them. They made a
> FOIA request back in April. DHS ignored it. And then EPIC filed a
> lawsuit on December 23, 2011 when the agency failed to comply with the
> FOIA deadlines. And as a result of filing the lawsuit, DHS disclosed to
> EPIC 285 pages of documents. So I just want to make a note of that, that
> you shouldn't stonewall FOIA requests. You should comply with them
> within the deadlines. No entity should be required to file a lawsuit….
>
> But what's interesting about what they have pointed out is that, while you
> say there's no personally identified information in this contract with
> General Dynamics in fact, they point out that there are some exceptions to
> the "no-PII" rule… I find that outrageous. And I would like to ask you to
> amend the contract with General Dynamics to exempt that kind of
> information from being collected.

*Enhancing Intelligence Gathering and Ensuring Privacy, hearing on DHS Monitoring of*

*Social Networking and Media before the Committee on Homeland Security's*

*Subcommittee on Counterterrorism and Intelligence*, 112th Cong. (2012) (comments of

---

[12] http://homeland.house.gov/hearing/subcommittee-hearing-dhs-monitoring-social-networking-and-media-enhancing-intelligence

Jackie Speier, Ranking Member, Subomm. On Counterterrorism and Intelligence).[13] This

Congressional hearing inspired a series of reports from various news organizations on the

documents EPIC obtained. The *New York* Times reported:

> To produce the report about Standish, the contractor used "Facebook,
> Twitter, three different blogs and reader comments" on an article on The
> Washington Post's Web site, highlighting "public sentiments in extensive
> detail," according to a summary of the report that was included as an
> example in a "Social Networking/Media Capability Analyst Handbook"
> dated February 2010. …
>
> The report about Standish residents was part of nearly 300 pages of
> documents about the monitoring program obtained under the Freedom of
> Information Act by the Electronic Privacy Information Center, a nonprofit
> advocacy group."

Charlie Savage, "Federal Contractor Monitored Social Network Sites," *New York Times*,

Feb. 13, 2012, at A13. [14] *See also* Charlie Savage, "Homeland Analysts Told to Monitor

Policy Debates in Social Media," *New York Times,* Feb. 22, 2012, at A17.[15]. Additional

news stories appeared within the next few months regarding EPIC's acquisition and

publication of the list of DHS's "keywords," which the agency uses to collect information

from social networking sites. An article in *Forbes* magazine reported:

> DHS has been forced to release a list of keywords and phrases it uses to
> monitor various social networking sites. The list provides a glimpse into
> what DHS describes as 'signs of terrorist or other threats against the U.S.'
>
> The list was posted by the Electronic Privacy Information Center who
> filed a request under the Freedom of Information Act, before suing to
> obtain the release of the documents. The documents were part of the
> department's 2011 "Analyst's Desktop Binder" used by workers at their
> National Operations Center which instructs workers to identify 'media

---

[13] http://homeland.house.gov/hearing/subcommittee-hearing-dhs-monitoring-social-
networking-and-media-enhancing-intelligence
[14] http://www.nytimes.com/2012/01/14/us/federal-security-program-monitored-public-
opinion.html
[15] http://www.nytimes.com/2012/02/23/us/house-questions-homeland-security-program-
on-social-media.html

reports that reflect adversely on DHS and response activities'.

The information sheds new light on how government analysts are instructed to patrol the internet searching for domestic and external threats. The Daily Mail's article noted the Electronic Privacy Information Center wrote a letter to the House Homeland Security Subcommittee on Counter-terrorism and Intelligence, describing its choice of words as 'broad, vague and ambiguous'."

Reuven Cohen, "Dept. of Homeland Security Forced to Release List of Keywords Used to Monitor Social Networking Sites," *Forbes*, May 26, 2012.[16]

 "Commercial benefit to the complainant" might preclude an award if the beneficiary is a "large corporate interest (or a representative of such an interest)." *Freedom of Information Act and Amendments of 1974 Source Book* at 171. However, commercial benefit does not bar recovery "where the complainant was indigent or a nonprofit public interest group." *Id.* EPIC is a 501(c)(3) non-profit public interest research center. *Elec. Privacy Info. Ctr.* 241 F. Supp. 2d 5. EPIC derived no commercial benefit from its FOIA request or lawsuit. The sole benefit was derived by the public, which benefited from the disclosure of the body scanner documents released in this case.

The "nature of the [complainant's] interest" factor is "closely related [to] and often considered together" with the commercial benefit criterion. *Tax Analysts v. Dep't of Justice*, 965 F.2d 1092, 1095 (D.C. Cir. 1992) Favored interests are "scholarly, journalistic or public-interest oriented." *Freedom of Information Act and Amendments of 1974 Source Book* at 171. *See Long v. IRS*, 932 F.2d 1309, 1316 (9th Cir. 1991) (holding that a lower court's ruling that the plaintiff's scholarly interest weighed against her recovery of fees was held "wrong as a matter of law and an abuse of discretion."). As set

---

[16] http://www.forbes.com/sites/reuvencohen/2012/05/26/department-of-homeland-security-forced-to-release-list-of-keywords-used-to-monitor-social-networking-sites/

forth above, EPIC's interest in this matter is squarely within the "scholarly, journalistic or public-interest oriented" interests favored by the statute. *See, e.g., Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.,* 760 F. Supp. 2d 4, 44 (D.D.C. 2011) ("[EPIC's] aims, which include dissemination of information regarding privacy issues to the public, . . . fall within the scholarly and public-interest oriented goals promoted by FOIA, . . .")

   The DHS did not have a "reasonable legal basis" for failing to disclose records to EPIC. The DHS's delay in replying to EPIC's request and appeal plainly violated the FOIA's statutory deadlines. *See* 5 U.S.C. § 552(a)(6)(A). As described in EPIC's Complaint, the DHS violated statutory deadlines by failing to make a timely determination concerning EPIC's administrative request and appeal. Compl. at ¶¶50-58. The DHS has cited no legal basis in opposition to EPIC's claims regarding the untimeliness of the agency's response – in fact, the DHS has not attempted to account for the delay at all. The agency explains its internal process for sorting and responding to FOIA requests but avoids addressing its violation of the statutory deadline.

   In this case, EPIC was forced to sue the DHS in order to obtain critical information concerning the DHS' social media monitoring program. The DHS had no reason or legal basis to withhold these records. The agency must reimburse EPIC for its costs and fees.

## CONCLUSION

As discussed above, Defendant's Motion for Summary Judgment should be denied. The Court should order Defendant to revise the Vaughn Index to provide the proper specificity required to analyze the Defendant's withholdings. Additionally, the Court should order the Defendant to undertake a proper segregability analysis and disclose all segregable documents. In addition, Plaintiff is entitled to recover its costs and fees because it has "substantially prevailed" in this case regardless of the outcome of the parties' cross-motions for summary judgment.

Respectfully submitted,
_____/s/ Ginger P. McCall_____
GINGER P. MCCALL (DC Bar # 1001104)
MARC ROTENBERG (DC Bar # 422825)
Electronic Privacy Information Center
1718 Connecticut Ave. NW
Suite 200
Washington, DC 20009
(202) 483-1140
*Counsel for Plaintiff*

Dated: September 21, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of September, 2012, I served the foregoing
PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT, including all exhibits
and attachments, by electronic case filing upon:

     STUART F. DELERY
     Assistant Attorney General
     U.S. Department of Justice

     JEAN-MICHEL VOLTAIRE
     U.S. Department of Justice
     Civil Division, Federal Programs Branch


             _____*/s/ Ginger P. McCall*_____
             GINGER P. MCCALL (DC Bar # 1001104)
             *Counsel for Plaintiff*