**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| ELECTRONIC PRIVACY | ) | |
| INFORMATION CENTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:11-02261 (JDB) |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

_____

## PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS

Plaintiff the Electronic Privacy Information Center ("EPIC") hereby moves for an order compelling Defendant U.S. Department of Homeland Security (the "DHS") to pay EPIC's attorneys' fees and costs in this lawsuit. EPIC's Freedom of Information Act ("FOIA") lawsuit forced disclosure of hundreds of pages of DHS records. The records would have otherwise remained secret. EPIC is therefore eligible to recover fees and costs pursuant to 5 U.S.C. § 552(a)(4)(E). EPIC's fees and costs total $30,590.75 and are supported by the attached affidavits, time records, and receipt.

Pursuant to this Court's Order of March 4, 2013 [CITE] and Local Rule 54.2(a) EPIC has conferred with DHS in an attempt to reach an agreement on fee issues. DHS opposes this motion.

## FACTUAL BACKGROUND

On February 1, 2011, DHS announced that the agency planned to implement "Publicly Available Social Media Monitoring and Situational Awareness Initiatives." The initiatives were designed to gather information from "online forums, blogs, public websites,

and message boards," to store and analyze the information gathered, and then to "disseminate relevant and appropriate de-identified information to federal, state, local, and foreign governments and private sector partners." 76 Fed. Reg. 5603 (2011).

Previously, DHS had undertaken surveillance of public chats and other online forums concerning specific events, such as the January 2010 earthquake in Haiti, the 2010 Winter Olympics, and the April 2010 BP oil spill. *See* DHS, Privacy Impact Assessment for the Office of Operations Coordination and Planning Haiti Social Media Disaster Monitoring Initiative, January 21, 2010*;* DHS, Privacy Impact Assessment for the Office of Operations Coordination and Planning 2010 Winter Olympics Social Media Event Monitoring Initiative, February 10, 2010; DHS, Privacy Impact Assessment for the Office of Operations Coordination and Planning April 2010 BP Oil Spill Response Social Media Event Monitoring Initiative, April 29, 2010. In June of 2010, however, DHS signaled its intention to pursue ongoing monitoring of social media services. Department of Homeland Security, Privacy Impact Assessment for the Office of Operations Coordination and Planning Publicly Available Social Media Monitoring and Situational Awareness Initiative, 2, June 22, 2010. As set out in the Federal Register and the Privacy Impact Assessments, the DHS's social media monitoring initiative would allow the agency to "establish [fictitious] usernames and passwords," create covert social media profiles to monitor other users, deploy search tools, and record the online activity of particular users, based on the presence of such search terms as "drill," "infection," "strain," "recovery," "collapse," "human to animal," and "Trojan." Department of Homeland Security, Privacy Impact Assessment for the Office of Operations Coordination and Planning Publicly Available Social Media Monitoring and Situational Awareness Initiative, 23, Jan. 6, 2011.

DHS stated that it intended to store the information that it obtained from the users of online services for up to five years and to make the information available across the government, including local, state, and federal agencies, and to make it available to organizations outside of the United States. 76 Fed. Reg. 5603, 5605. The proposed social media monitoring initiative was designed to gather personally identifiable information ("PII"), including full names, affiliations, positions or titles, and account usernames. *Id.* The agency stated that it would collect PII "when it lends credibility to the report or facilitates coordination with federal, state, local, tribal, territorial, foreign or international government partners." *Id.* at 5604. The agency anticipates retrieving users' information in the normal course of performing social media searches and plans regularly to relay the records it produces to its information sharing partners   (although the agency states that it will redact PII before dissemination). *Id.* According to the DHS Chief Privacy Officer, "[n]o procedures are in place" to determine which users may access this system of records; even Department contractors have full access to the system. DHS, Privacy Impact Assessment, 7, Jan. 6, 2011.

Users of social media services, such as Twitter, often provide sensitive and personal information in their online communications, and they have no reason to believe that the Department of Homeland Security would routinely record their messages or distribute the contents of their messages to other government agencies and private parties.

### EPIC's Filed EPIC's FOIA Request and Exhausted Administrative Appeals

In order to allow the public to assess the privacy risks to social media users, on April 12, 2011, EPIC transmitted its written Freedom of Information Act request ("EPIC's FOIA request") to DHS for records concerning the agency's social media monitoring initiatives.

Specifically, EPIC asked the DHS to disclose:

1.    all contracts, proposals, and communications between the federal government and third parties, including, but not limited to, H.B. Gar Federal, Palantir Technologies, and/or Berico Technologies, and/or parent or subsidiary companies, that include provisions concerning the capability of social media monitoring technology to capture, store, aggregate, analyze, and/or match personally-identifiable information;

2.    all contracts, proposals, and communications between the federal government and third parties, including, but not limited to, H.B. Gar Federal, Palantir Technologies, and/or Berico Technologies, and/or parent or subsidiary companies, that include provisions concerning the capability of social media monitoring technology to capture, store, aggregate, analyze, and/or match personally-identifiable information;

3.    all documents used by DHS for internal training of staff and personnel regarding social media monitoring, including any correspondence and communications between DHS, internal staff and personnel, and/or privacy officers, regarding the receipt, use, and/or implementation of training and evaluation of documents;

4.    all documents detailing the technical specifications of social media monitoring software and analytic tools, including any security measures to protect records of collected information and analysis; and

5.    all documents concerning data breaches of records generated by social media monitoring technology.

EPIC also asked DHS to expedite the response to EPIC's FOIA request as it

pertained to a matter about which there is an urgency to inform the public about an actual

federal government activity, and was made by a person primarily engaged in disseminating

information. 5 U.S.C. § 552(a)(6)(E) (2011). EPIC requested "News Media" fee status,

based on its well established status as a "representative of the news media." *EPIC v. Dep't

of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003). Additionally, EPIC asked for fee waiver. *Id.*

On April 28, 2011, DHS acknowledged receipt of EPIC's FOIA request on April 19,

2011, and assigned the request reference number DHS/OS/PRIV 11-0736 ("DHS' email").

DHS made no determination on EPIC's fee waiver request. DHS denied EPIC's request for expedited processing and for "news media" fee status. DHS referred EPIC's request to several DHS components for processing.

On May 18, 2011, via certified mail, EPIC appealed the DHS's response to EPIC's FOIA request [hereinafter "EPIC's Appeal"]. EPIC also challenged the DHS's denial of EPIC's request for "news media" fee status, and renewed EPIC's request for a fee waiver and expedited processing for the appeal.  DHS received EPIC's Appeal on May 23, 2011.

**DHS Failed to Respond to EPIC's Request Within the Statutory Time Limit**

EPIC filed suit against the agency on December 20, 2011, after the agency failed to respond to the EPIC's Appeal. This was more than seven months after EPIC's FOIA Request was received by the agency.

**In Response to EPIC's Lawsuit, the DHS Disclosed Responsive Documents**

On January 10, 2012, as a result of this lawsuit, DHS produced 285 pages of responsive documents ("First Interim Response"). On February 6, 2012, the agency released an additional 39 pages of documents ("Second Interim Response"). On May 31, 2012, the agency released another 213 pages of documents ("Third Interim Response"). On July 9, 2012, the agency released a final 80 pages of documents ("Final Interim Response"). In EPIC's Motion for Summary Judgment, EPIC challenged the agency's segregability analysis. The Court agreed, and in the Court's March 4, 2013 order, the Court ordered DHS to disclose portions of several documents that had previously been withheld in full. The agency complied, delivering the documents to EPIC on March 22, 2013.

EPIC now seeks to recover fees and costs pursuant to 5 U.S.C. § 552(a)(4)(E).

## STANDARD OF REVIEW

Before a court may award attorneys' fees in FOIA cases, it must first determine whether the plaintiff is eligible for a fee award. *Tax Analysts v. Dep't of Justice*, 965 F.2d 1092, 1093 (D.C. Cir. 1992). If a plaintiff is eligible, the court must then determine whether the plaintiff is entitled to recover fees. *Id.*

In a FOIA lawsuit, "The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). "A complainant has substantially prevailed if the complainant has obtained relief through either (I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii).

Pursuant to 5 U.S.C. § 552(a)(4)(E)(i)(I), a plaintiff can obtain attorneys' fees under the "catalyst theory," which provides for fee awards when a plaintiff's suit results in a "voluntary or unilateral change in position by the agency." The determination of whether the plaintiff has "substantially prevailed" under the catalyst theory is "largely a question of causation." *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1496 (D.C. Cir. 1984); *Church of Scientology v. Harris*, 653 F.2d 584, 587 (D.C. Cir. 1981). The key inquiry is "did the institution and prosecution of the litigation cause the agency to release the documents obtained during the pendency of the litigation?" *Church of Scientology*, 653 F.2d at 587.

    **I.**    **EPIC Is Eligible for and Entitled to Recover Its Costs and Fees**

        **A.**  **EPIC Eligible Because EPIC "Substantially Prevailed" by Forcing Disclosure of DHS Records**

Irrespective of the outcome of the parties' cross-motions for summary judgment, EPIC is entitled to recover its fees and costs from the DHS in this matter. EPIC asks the Court to enter judgment as to EPIC's eligibility and entitlement to fees and to order further briefing as to the amount of costs and fees.

EPIC is eligible for fees under the FOIA because EPIC "substantially prevailed" in this case. 5 U.S.C. § 552(a)(4)(E). "The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." *Id.* "A complainant has substantially prevailed if the complainant has obtained relief through … a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." *Id.* The determination of whether the plaintiff has "substantially prevailed" is "largely a question of causation." *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1496 (D.C. Cir. 1984); *Church of Scientology v. Harris*, 653 F.2d 584, 587 (D.C. Cir. 1981). The key inquiry is "did the institution and prosecution of the litigation cause the agency to release the documents obtained during the pendency of the litigation?" *Church of Scientology*, 653 F.2d at 587.

EPIC has already "substantially prevailed" in this lawsuit. As described above and in the Defendant's Motion for Summary Judgment, EPIC filed its FOIA request concerning social media monitoring on April 12, 2011. On May 18, 2010 EPIC mailed an administrative appeal to the DHS, challenging the agency's denial of EPIC's request for "news media" fee status, and the denial of fee waiver and expedited processing. On December 20, 2011, EPIC filed this lawsuit challenging the agency's failure to comply with the statutory deadline to reply to EPIC's appeal.

On January 10, 2012, only after the filing of this lawsuit, DHS produced the first substantive response to EPIC's FOIA Request. The agency provided EPIC with 285 pages of responsive documents. On February 6, 2012, the agency released an additional 39 pages of documents.  On May 31, the Secret Service, a DHS component, provided EPIC with another 213 pages of documents. Finally, on July 9, the agency provided EPIC with 80 more pages of documents. "The institution and prosecution" of this suit plainly "cause[d] the agency to release the documents obtained during the pendency of the litigation." *Id.*

### B.  EPIC has Satisfied the Four Prong Test for Entitlement to Fees

EPIC is also entitled to fees under the four factor test employed by this circuit. "The court should consider [four factors] in determining the appropriateness of an award of costs and attorney fees." *Cuneo v. Rumsfeld*, 553 F.2d 1360, 1365 (D.C. Cir. 1977). The four factors are: 1) "the benefit to the public, if any, deriving from the case;" 2) "the commercial benefit of the complainant;" 3) "the nature of [the complainant's] interest in the records sought"; and 4) "whether the government's withholding of the records sought had a reasonable basis in law." H. Comm. on Gov't Operations and S. Comm. on the Judiciary, 94th Cong., *Freedom of Information Act and Amendments of 1974 (Pub. L. No. 93-502) Source Book,* 189-90 (J. Comm. Print 1975).

"Public benefit" can be demonstrated by a "newsman who seeks information to be used in a publication or the public interest group seeking information to further a project benefitting the general public." *Davy v. C.I.A.*, 550 F.3d 1155, 1158 (D.C. Cir. 2008). The "public benefit" factor supports an award where the complainant's victory is "likely to add to the fund of information that citizens may use in making in making vital political

choices." *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995) (citations omitted).

D.C. District Court has found that news media coverage is relevant for determining

"public benefit." *EPIC v. U.S. Dept. of Homeland Sec.*, 811 F. Supp. 2d 216, 233-34

(D.D.C. 2011).

      EPIC's FOIA suit provided substantial benefit to the public. EPIC maintains two

of the most popular websites in the world - www.epic.org and www.privacy.org - for

searches on the term "privacy." EPIC disseminated the agency records it received on its

www.epic.org web site[1] and to the approximately 8,000 recipients of its bi-weekly

newsletter.[2] EPIC's FOIA work in this matter was prominently featured in the

*Washington Post* as well as several other publications.

> With the explosion of digital media, DHS has joined other intelligence and
> law enforcement agencies in monitoring blogs and social media, which is
> seen as a valuable tool in anticipating trends and threats that affect
> homeland security, such as flu pandemics or a bomb plot.
>
> But monitoring for "positive and negative reports" on U.S. agencies falls
> outside the department's mission to "secure the nation," said the
> Electronic Privacy Information Center, which obtained a copy of a
> contract and related material describing DHS's social media monitoring
> through its FOIA suit.
>
> According to the documents, the department's Office of Operations
> Coordination and Planning awarded a contract in 2010 to Fairfax-based
> General Dynamics' Advanced Information Systems. The company's task
> is to provide media and social media monitoring support to Homeland
> Security's National Operations Center (NOC) on a "24/7/365 basis" to
> enhance DHS's "situational awareness, fusion and analysis and decision
> support" to senior leaders.

---

[1] http://epic.org/foia/epic-v-dhs-media-monitoring/
[2] http://epic.org/alert/epic_alert_1825.html

Ellen Nakashima, "DHS monitoring of social media concerns civil liberties advocates,"
*Washington Post*, Jan. 13, 2012.[3] *See also* "Privacy Group Sues DHS Over Social Media
Monitoring Program," FOX News, Dec. 24, 2011;[4] Liz Klimas, "Which Keywords On
Twitter Get the Government's Attention?" The Blaze, Dec. 28, 2011;[5] Mark Hosenball,
"Homeland Security watches Twitter, social media," Reuters, Jan. 11, 2012;[6] Jaikumar
Vijayan "DHS media monitoring could chill public dissent, EPIC warns," Computer
World, Jan. 16, 2012;[7] J. David Goodman, "Travelers Say They Were Denied Entry to
U.S. for Twitter Jokes," *New York Times*, Jan. 30, 2012;[8] Mark Rockwell, "DHS social
media monitoring practices revealed under FOIA," Government Security News, May 29,
2012;[9] Robert N. Charette, "Do You Need to Worry About DHS Looking at Your Social
Media Conversations?" IEEE Spectrum, May 29, 2012;[10] Kevin Fogarty, "DHS list of
words you should never ever blog or Tweet. Ever." IT World, May 31, 2012.[11]

     EPIC's work in this matter also contributed significantly to the oversight
functions of Congress. On February 16, 2012, Congresss held a hearing entitled "DHS
Monitoring of Social Networking and Media: Enhancing Intelligence Gathering and
Ensuring Privacy." Representative Patrick Meehan, the Chairman of the Subcommittee
on Counterterrorism and Intelligence, stated:

---

[3] http://www.washingtonpost.com/world/national-security/dhs-monitoring-of-social-media-worries-civil-liberties-advocates/2012/01/13/gIQANPO7wP_story.html
[4] http://www.foxnews.com/politics/2011/12/24/privacy-group-sues-dhs-over-social-media-monitoring-program
[5] http://www.theblaze.com/stories/which-keywords-on-twitter-get-the-governments-attention/
[6] http://www.reuters.com/article/2012/01/11/us-usa-homelandsecurity-websites-idUSTRE80A1RC20120111
[7] http://www.computerworld.com/s/article/9223441/DHS_media_monitoring_could_chill_public_dissent_EPIC_warns
[8] http://thelede.blogs.nytimes.com/2012/01/30/travelers-say-they-were-denied-entry-to-u-s-for-twitter-jokes/
[9] http://www.gsnmagazine.com/node/26448?c=federal_agencies_legislative
[10] http://spectrum.ieee.org/riskfactor/telecom/internet/do-you-need-to-be-careful-about-the-words-you-use-in-social-media-conversations
[11] http://www.itworld.com/security/279429/dhs-list-words-you-should-never-ever-blog-or-tweet-ever

A few weeks ago, it was reported that DHS had instituted a program to produce short reports about threats and hazards. However, in something that may cross the line, these reports also revealed that DHS had tasked analysts with collecting intelligence on media reports that reflect adversely on the U.S. Government and the Department of Homeland Security.

In one example, DHS used multiple social networking tools - including Facebook, Twitter, three different blogs, and reader comments in newspapers to capture resident's reactions to a possible plan to bring Guantanamo detainees to a local prison in Standish, MI.

In my view, collecting, analyzing, and disseminating private citizens' comments could have a chilling effect on individual privacy rights and people's freedom of speech and dissent against their government.

*Enhancing Intelligence Gathering and Ensuring Privacy, hearing on DHS Monitoring of*

*Social Networking and Media before the Committee on Homeland Security's*

*Subcommittee on Counterterrorism and Intelligence*, 112th Cong. (2012) (statement of

Patrick Sheehan, Chairman, Subomm. On Counterterrorism and Intelligence).[12]

Representative Jackie Speier, the Subcommittee's ranking member, stated:

I am deeply troubled by the document that has just been put into the record by epic.org, and while you have probably not had the opportunity yet to review it, Mr. Chairman, I would like to ask, after they do review it, to report back to this Committee, and provide us with answers to the questions raised. So I'm going to start with a couple of them. They made a FOIA request back in April. DHS ignored it. And then EPIC filed a lawsuit on December 23, 2011 when the agency failed to comply with the FOIA deadlines. And as a result of filing the lawsuit, DHS disclosed to EPIC 285 pages of documents. So I just want to make a note of that, that you shouldn't stonewall FOIA requests. You should comply with them within the deadlines. No entity should be required to file a lawsuit….

But what's interesting about what they have pointed out is that, while you say there's no personally identified information in this contract with General Dynamics in fact, they point out that there are some exceptions to the "no-PII" rule… I find that outrageous. And I would like to ask you to amend the contract with General Dynamics to exempt that kind of information from being collected.

---

[12] http://homeland.house.gov/hearing/subcommittee-hearing-dhs-monitoring-social-networking-and-media-enhancing-intelligence

*Enhancing Intelligence Gathering and Ensuring Privacy, hearing on DHS Monitoring of Social Networking and Media before the Committee on Homeland Security's Subcommittee on Counterterrorism and Intelligence*, 112th Cong. (2012) (comments of Jackie Speier, Ranking Member, Subomm. On Counterterrorism and Intelligence).[13] This Congressional hearing inspired a series of reports from various news organizations on the documents EPIC obtained. The *New York* Times reported:

> To produce the report about Standish, the contractor used "Facebook, Twitter, three different blogs and reader comments" on an article on The Washington Post's Web site, highlighting "public sentiments in extensive detail," according to a summary of the report that was included as an example in a "Social Networking/Media Capability Analyst Handbook" dated February 2010. …
>
> The report about Standish residents was part of nearly 300 pages of documents about the monitoring program obtained under the Freedom of Information Act by the Electronic Privacy Information Center, a nonprofit advocacy group."

Charlie Savage, "Federal Contractor Monitored Social Network Sites," *New York Times*, Feb. 13, 2012, at A13. [14] *See also* Charlie Savage, "Homeland Analysts Told to Monitor Policy Debates in Social Media," *New York Times,* Feb. 22, 2012, at A17.[15]. Additional news stories appeared within the next few months regarding EPIC's acquisition and publication of the list of DHS's "keywords," which the agency uses to collect information from social networking sites. An article in *Forbes* magazine reported:

> DHS has been forced to release a list of keywords and phrases it uses to monitor various social networking sites. The list provides a glimpse into what DHS describes as 'signs of terrorist or other threats against the U.S.'
>
> The list was posted by the Electronic Privacy Information Center who

---

[13] http://homeland.house.gov/hearing/subcommittee-hearing-dhs-monitoring-social-networking-and-media-enhancing-intelligence

[14] http://www.nytimes.com/2012/01/14/us/federal-security-program-monitored-public-opinion.html

[15] http://www.nytimes.com/2012/02/23/us/house-questions-homeland-security-program-on-social-media.html

filed a request under the Freedom of Information Act, before suing to obtain the release of the documents. The documents were part of the department's 2011 "Analyst's Desktop Binder" used by workers at their National Operations Center which instructs workers to identify 'media reports that reflect adversely on DHS and response activities'.

The information sheds new light on how government analysts are instructed to patrol the internet searching for domestic and external threats. The Daily Mail's article noted the Electronic Privacy Information Center wrote a letter to the House Homeland Security Subcommittee on Counter-terrorism and Intelligence, describing its choice of words as 'broad, vague and ambiguous'."

Reuven Cohen, "Dept. of Homeland Security Forced to Release List of Keywords Used to Monitor Social Networking Sites," *Forbes*, May 26, 2012.[16]

 "Commercial benefit to the complainant" might preclude an award if the beneficiary is a "large corporate interest (or a representative of such an interest)." *Freedom of Information Act and Amendments of 1974 Source Book* at 171. However, commercial benefit does not bar recovery "where the complainant was indigent or a nonprofit public interest group." *Id.* EPIC is a 501(c)(3) non-profit public interest research center. *EPIC,* 241 F. Supp. 2d at 5. EPIC derived no commercial benefit from its FOIA request or lawsuit. The sole benefit was derived by the public, which benefited from the disclosure of the body scanner documents released in this case.

The "nature of the [complainant's] interest" factor is "closely related [to] and often considered together" with the commercial benefit criterion. *Tax Analysts v. Dep't of Justice*, 965 F.2d 1092, 1095 (D.C. Cir. 1992) Favored interests are "scholarly, journalistic or public-interest oriented." *Freedom of Information Act and Amendments of 1974 Source Book* at 171. *See Long v. IRS*, 932 F.2d 1309, 1316 (9th Cir. 1991) (holding that a lower court's ruling that the plaintiff's scholarly interest weighed against her

---

[16] http://www.forbes.com/sites/reuvencohen/2012/05/26/department-of-homeland-security-forced-to-release-list-of-keywords-used-to-monitor-social-networking-sites/

recovery of fees was held "wrong as a matter of law and an abuse of discretion."). As set forth above, EPIC's interest in this matter is squarely within the "scholarly, journalistic or public-interest oriented" interests favored by the statute. *See, e.g., EPIC v. United States Dep't of Homeland Sec.,* 760 F. Supp. 2d 4, 44 (D.D.C. 2011) ("[EPIC's] aims, which include dissemination of information regarding privacy issues to the public, . . . fall within the scholarly and public-interest oriented goals promoted by FOIA, . . .")

The DHS did not have a "reasonable legal basis" for failing to disclose records to EPIC. The DHS's delay in replying to EPIC's request and appeal plainly violated the FOIA's statutory deadlines. *See* 5 U.S.C. § 552(a)(6)(A). As described in EPIC's Complaint, the DHS violated statutory deadlines by failing to make a timely determination concerning EPIC's administrative request and appeal. Compl. at ¶¶50-58. The DHS has cited no legal basis in opposition to EPIC's claims regarding the untimeliness of the agency's response – in fact, the DHS has not attempted to account for the delay at all. The agency explains its internal process for sorting and responding to FOIA requests but avoids addressing its violation of the statutory deadline.

In this case, EPIC was forced to sue the DHS in order to obtain critical information concerning the DHS' social media monitoring program. The DHS had no reason or legal basis to withhold these records. The agency must reimburse EPIC for its costs and fees. As this Court stated, "[a]lthough the Court is not deciding the issue at this time, it notes, in the hope of guiding the parties' discussions, that EPIC will be entitled to some amount of fees and costs, given the agency's release of responsive documents, the Vaughn index revisions, and the Court's resolution of the instant motions." EPIC v. DHS, No. 11-02261, slip op. at 9 (D.D.C. Mar. 4, 2013).

II.     **EPIC's Attorneys' Fees and Costs are Reasonable**

a.      **EPIC Requests $30,590.75 in Costs and Fees**

EPIC's fees and costs incurred in this matter are set forth in detail in Exhibit 1 –

"EPIC's Bill of Fees and Costs." EPIC moves the Court to award EPIC a total of

$30,590.75 – $30,240.75 in attorneys' fees and $350 in costs. EPIC's request for

attorneys' fees is supported by contemporaneously-recorded time records kept by EPIC's

attorneys. Exhibits 1-3. EPIC's request is further supported by Affidavits. McCall Aff.;

Rotenberg Aff.; Stepanovich Aff.; Horwitz Aff.; Butler Aff.; Brody Aff.; Scott Aff.

EPIC's request for costs is supported by reliable documentation – a receipt issued by the

clerk of this Court reflecting EPIC's payment of the filing fee in this matter. Exhibit 5. As

set forth below, EPIC's fees and costs in this matter are reasonable.

b.      **The Laffey Matrix Provides a Reasonable Minimum Basis for
        Calculating EPIC's Fees**

To determine whether fees are reasonable, courts focus on two questions: (1) whether

the attorneys charged a reasonable hourly rate and (2) whether the time attorneys logged

on the case was reasonable - i.e., did the attorneys waste or otherwise unnecessarily

spend time on the matter. *Nat. Veterans Legal Services Program v. U.S. Dept. of

Veterans Affairs,* 1:96-CV-01740-NHL, 1999 WL 33740260 (D.D.C. Apr. 13, 1999).

Attorneys' fees are calculated based on the "lodestar," which is the number of hours the

lawyers reasonably spent on the case multiplied by the lawyers' hourly rates. *See

generally Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Dixie Fuel Co. v. Callahan*,

136 F. Supp. 2d 659, 666-67 (E.D. Ky. 2001); *Consumers Union v. Fed. Reserve Sys.*,

410 F. Supp. 63, 64 (D.D.C. 1975). A lawyer's hourly rate is measured by its "fair market

value," as well as "the quality of the attorney's work." *See generally Johnson v. Ga.*

*Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) (enumerating fee calculation factors in civil rights cases); *Evans v. Sheraton Park Hotel*, 503 F.2d 177, 187-88 (D.C. Cir. 1974), cited with approval in *Copeland v. Marshall*, 641 F.2d 880, 889 (D.C. Cir. 1980) (en banc). "The District of Columbia Circuit has concluded that the second prong of the equation for calculating a fee award -- the reasonableness of hourly rates awarded under fee-shifting statutes -- consists of 'at least three elements: the attorneys' billing practices; the attorneys' skill, experience, and reputation; and the prevailing market rates in the relevant community.'" *American Lands Alliance v. Norton*, 525 F. Supp. 2d 135 (D.D.C. 2007) *citing Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995).

If an attorney regularly bills clients for legal services, his normal billing rate is presumed to be the "fair market value" of the attorneys' work. *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988); *citing Laffey v. Northwest Airlines*, 746 F.2d 4, 16 n.74 (D.C. Cir. 1986). However, "for an attorney who has no customary hourly rate, the Court must look to the prevailing community rates in order to determine the appropriate hourly rate." *Save Our Cumberland Mountains*, 857 F.2d at 1518; *citing Blum v. Stenson*, 465 U.S. 886 (1984). "In the case of the public interest nonprofit law firm, [when] the attorneys have no billing histories," a "proxy for the market must be found in order to set a reasonable hourly rate." *Laffey*, 746 F.2d at 16 n.74.

> In *Laffey*, the District of Columbia Circuit affirmed the District Court's reasonableness assessment for measuring reasonable hourly rates, now commonly known as the Laffey Matrix. The Laffey Matrix designates what are reasonable hourly rates for attorneys of varying experience, and is adjusted annually based on cost of living increases. *Falica v. Advance Tenant Servs., Inc.*, 384 F. Supp. 2d 75, 78 (D.D.C. 2005). As this Court

previously reiterated, "[u]sing this matrix as a guide, the Court must then exercise its discretion to adjust this sum upward or downward to arrive at a final fee award that reflects the characteristics of the particular case (and counsel) for which the award is sought." *Id.* (quoting *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354, 361 (D.D.C. 1983)). Additionally, parties "may point to such evidence as an updated version of the *Laffey* matrix or the [United States] Attorney's Office matrix, or their own survey of prevailing market rates in the community." *Covington*, 57 F.3d at 1109.

*American Lands Alliance*, 525 F. Supp. 2d at 148-49.

The Laffey Matrix is published by the Department of Justice at:

http://www.justice.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_8.html and is

attached as Exhibit 5.

### III.     EPIC is Entitled to Recover "Fees on Fees"

EPIC is entitled to recover fees on fees for the time spent litigating the fee issue

against the DHS. This Court previously upheld fees on fees in the FOIA context.

*Judicial Watch, Inc. v. U.S. Dept. of Homeland Sec.,* CIV.A.08-2133, 2009 WL 1743757

(D.D.C. June 15, 2009); *Nat. Veterans Legal Services Program v. U.S. Dept. of Veterans*

*Affairs,* 1:96-CV-01740-NHL, 1999 WL 33740260 (D.D.C. Apr. 13, 1999).  The Court

likened fees in FOIA suits to fees available in other similar statutory frameworks. "Fees-

on-fees are available Title VII and Equal Access to Justice Act cases which are similar to

FOIA actions." *Nat. Veterans Legal Services Program v. U.S. Dept. of Veterans Affairs,*

1:96-CV-01740-NHL, 1999 WL 33740260 (D.D.C. Apr. 13, 1999), internal citations

omitted, citing *Commissioner v. Jean,* 496 U.S. 154, 110 S.Ct. 2316, 110 L.Ed.2d

134(1990); *Jones v. Lujan,* 887 F.2d 1096, 1099-1100 & n. 4 (D.C.Cir.1989); *Copeland*

*v. Marshall,* 641 F.2d 880, 896 & n. 29 (D.C.Cir.1980). The Court pointed out that fees

on fees had previously been upheld in the FOIA context. *Id. citing Assembly of the State*

*of California v. United States Department of Commerce,* No. Civ. S-91-990, 1993 WL

188328, at *16 (E.D.Cal. May 28, 1993). *Assembly of the State of California* court held that "a review of the language and purpose of the FOIA fees provision indicates that a request for fees on fees is proper under FOIA." *Id.* In *Nat. Veterans Legal Services*, the court upheld more than a thousand dollars in fees on fees.

EPIC has invested substantial time researching and preparing filing documents related to the fee issue and is entitled to be compensated for that time under the FOIA. EPIC's request for fees on fees is reasonable and supported by existing case law, including D.C. District Court case law – *Nat. Veterans Legal Services Program v. U.S. Dept. of Veterans Affairs* and *Judicial Watch v. Dept. of Homeland Security* – and should be granted by this court.

## <u>CONCLUSION</u>

As discussed above, EPIC substantially prevailed in this lawsuit, therefore triggering FOIA's fee-shifting provision. EPIC is eligible for and entitled to recover its fees and costs from the DHS in this matter. EPIC's fees are reasonable and supported by the attached affidavits and time records. EPIC moves the Court to award EPIC $30,590.75 in fees and costs. A proposed Order is attached.

Respectfully submitted,

_____*/s/ Ginger P. McCall*_____

GINGER P. MCCALL
MARC ROTENBERG
Electronic Privacy Information Center
1718 Connecticut Ave. NW
Suite 200
Washington, DC 20009

(202) 483-1140
*Counsel for Plaintiff*

Dated: April 10, 2013